UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ROBERT SCHECTER,

              Plaintiff,

v.

              Civil Action No. 07-419 (KSH)

EUGENE SCHECTER,

              **OPINION**

              Defendant.

**KATHARINE S. HAYDEN, U.S.D.J.**

**I.    INTRODUCTION**

This breach of contract action arose from an intra-family loan that has not yet been completely repaid. From 2002 to 2006, Robert Schecter (the plaintiff, hereinafter "Robert" for clarity) loaned his father Eugene Schecter (the defendant, hereinafter "Eugene") approximately $1 million for the purpose of purchasing certain real property for development. Robert alleges that Eugene owes him more than $220,000 under the oral contract, and that Eugene now refuses to pay. Eugene disputes neither the existence of the loan nor his ultimate obligation to repay Robert; rather, he disputes the amount owed and the timing of repayment. Robert has moved for summary judgment, which the Court now denies.

**II.    JURISDICTION & VENUE**

Diversity jurisdiction exists pursuant to 28 U.S.C. § 1332(a) because both parties are residents of different states and the amount in controversy exceeds $75,000. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a). See also D.E. # 13.

**III.   STANDARD OF REVIEW**

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must, of course, view the facts in the light most favorable to the non-moving party and draw all inferences in that party's favor. Gray v. York Newspapers, 957 F.2d 1070, 1078 (3d Cir. 1992). Summary judgment is improper if there is evidence sufficient to allow a reasonable jury to return a verdict for the non-moving party, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), or if the factual dispute is one "that might affect the outcome of the suit under the governing law . . . ." Id. The movant's burden, however, "may be discharged by 'showing' . . . that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Additionally, the non-movant "may not rest upon mere allegations or denials of the . . . pleading"; instead, the non-movant, "by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Matushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

**IV.   FACTUAL BACKGROUND & PROCEDURAL HISTORY**

Between July 2002 and October 2006, Robert loaned Eugene—through a number of direct payments and wire transfers—approximately $1 million so that Eugene could purchase and develop two properties in Santa Barbara California, known as the "Oceano Property" and the "Canon View Property." [1]  See Certification of Robert Schecter ("Robert's Cert.") ¶¶ 2-4.[2]

---

[1] The Oceano Property is located at 1575 La Vista Del Oceano, Santa Barbara, California. The Canon View Property is located at 62 Canon View, Santa Barbara, California. See Robert's Cert. ¶ 3.

Robert provided the funds using his personal assets, credit cards, and a home equity credit line through Chase Manhattan Bank.  See Robert's Cert. ¶ 5.  Robert and Eugene did not execute a written contract evidencing the loan or its terms.  Robert claims, over Eugene's denial, that the obligation to repay would be triggered upon any of the following:  (1) demand by Robert; (2) Eugene's refinancing of the debt secured by either property; or (3) upon the sale of either property.[3]  See Robert's Cert. ¶ 7.  He also argues that his father agreed to make the monthly debt service payments (about $1,500 per month) on Robert's credit line from Chase Manhattan. See Robert's Cert. ¶ 6.  After receiving the loan from his son, Eugene did in fact purchase the Canon View and Oceano Properties, see Schecter Cert. ¶¶ 8-9, and subsequently sold them in April 2005 and January 2008, respectively.  See Robert's Cert.  ¶ 25; Defendant's Brief in Opposition to Motion for Summary Judgment ("Def. Br.") at 5, ¶ 18.

In December 2005, Eugene refinanced the loan secured by the Oceano Property with a $500,000 loan from Washington Mutual, the net proceeds of which totaled about $246,000.  See Robert's Cert. ¶ 10.  Contrary to what Robert asserts was the intent of their arrangement, instead of using the loan proceeds for repayment, Robert says that Eugene purchased another property for development, the "Cliff Drive" Property.[4]  See Robert's Cert. ¶ 23; Def. Br. at 3, ¶ 9.

Eugene has not repaid his son in full; he has, however, made substantial repayments on the loan—Robert alleges that of the more than $1 million original principal, approximately $210,000 remains due.  With the addition of the alleged debt service payments, Robert claims that his father now owes him roughly $223,000.  See Robert's Cert. ¶ 21.  He asserts that the

---

[2] Unless stated otherwise, the factual statements taken from Robert's Certification are undisputed.

[3] Eugene does agree that repayment would be triggered upon the third occurrence—sale of the properties.  See infra.

[4] The Cliff Drive Property is located at 1538 Cliff Drive, Santa Barbara, California.  See Robert's Cert. ¶ 14.

debt has come into immediate repayment since each event that Robert claims would trigger repayment has occurred—he has demanded his father repay the loan, his father has refinanced the underlying debt, and his father has sold each of the properties purchased with the loaned funds.  See Robert's Cert. ¶¶ 8; 10; 12.  Because, he says, Eugene has breached the oral contract by steadfastly refusing to make good on the outstanding debt, resort to litigation has become necessary.

Robert filed this action in January 2007 alleging breach of contract and breach of the covenant of good faith and fair dealing implied in all contracts in New Jersey.  See Compl. ¶¶ 15-27.  In addition to demanding immediate repayment, the complaint requests the Court to impose an equitable lien on the Cliff Drive Property.  Id.  After filing the lawsuit, Robert also filed two notices of lis pendens with the Clerk of Santa Barbara County for the Cliff Drive Property and Oceano Property.  See Plaintiff's Brief in Support of Motion for Summary Judgment ("Pl. Br") at 9.  In December 2007, the parties entered into an escrow agreement under which certain proceeds from the sale of the Oceano Property would be held to ensure fulfillment of any judgment rendered by this Court.  Approximately $138,000 is currently held in the escrow account.  See Robert's Cert. ¶ 13.  In exchange, Robert agreed to remove the lis pendens notices on the properties.  See Certification of Salvatore Giampiccolo ("Giampiccolo Cert") Ex. J.  After denial of Eugene's motion to dismiss for improper venue [D.E. # 13] and upon conclusion of discovery, this motion followed.

In support of his motion, Robert relies on purported admissions made by Eugene during email correspondence with his son prior to the institution of this lawsuit.  See Robert's Cert. Exs. B, C, D, E, F, G, H, I, J.  These statements include:

4

- "I agree that the $210,069 is the balance remaining. . . . Next week I will send you 3 checks for $1,500 . . . ." See Robert's Cert. Ex. D.

- "Whatever I borrow would go directly to you with nothing taken out for me. Repayment of this loan would come off the top of the sale of any of the properties right after the mortgage companies. See Robert's Cert. Ex. E.

- "I will guarantee the loan will be paid back on time." See Robert's Cert. Ex. F.

As stated above, Eugene does not deny the fact that he owes his son money. See Def. Br. at 15. His position is simply that the oral contract was informal and dynamic, with no fixed repayment schedule. See Certification of Eugene Schechter ("Eugene's Cert.") ¶¶ 3-5. He disputes Robert's claim that repayment would be triggered upon demand or refinance of the loan, but agrees that repayment is due upon sale of the properties. See Eugene's Cert. ¶ 3; Def. Br. at 3. Having sold both properties, Eugene admits that the loan is presently due. While he has repaid 90% of the loan, he states that his ability to pay off the remainder has been temporarily hindered by the downturn in the California real estate market. See Eugene's Cert. ¶¶ 4-5. Because his understanding of the loan does not dictate *immediate* repayment in full, but permits flexibility in performance, he believes that the temporary delay in completing repayment does not constitute a material breach of the alleged agreement.

Further, notwithstanding his statement in the emailed correspondence that $210,069 is the outstanding amount owed (which he says has been taken out of context), Eugene asserts that $50,000 of this amount was agreed upon as part of a settlement "bonus" in connection with the sale of the Oceano Property. He believes that this settlement bonus has since been rendered void because Robert opted out of the pair's joint development venture. See Eugene Cert. ¶ 8. Thus, Eugene acknowledges only $160,000 in accumulated debt. See Eugene Cert. ¶ 12. Finally,

Eugene does not dispute that he agreed to make the monthly $1,500 debt service payments on Robert's behalf (and indeed did make several of these payments); however, he argues that these payments were also part of the unconsummated settlement agreement and were not part of the original deal. See Eugene's Cert. ¶ 13.

V.    DISCUSSION

   A.  Legal Standards

As always, in a diversity case the Court applies the substantive law of the state forum in which it sits. See Siemens Bldg. Techs., Inc. v. PNC Fin. Servs. Group, Inc., 226 Fed. App'x 192, 195 (3d Cir. 2007). New Jersey courts have long enforced oral contracts upon objective proof of offer, acceptance, and valid consideration. See, e.g., Cal. Natural, Inc. v. Nestle Holding Co., 631 F. Supp. 465, 470 (D.N.J. 1986); Comerata v. Chaumont, Inc., 52 N.J. Super. 299, 305 (App. Div. 1958); Shiddell v. Electro Rust-Proofing Corp., 34 N.J. Super. 278, 290 (App. Div. 1954). When interpreting any contract, the Court's "obligation . . . is clear":

> First and foremost, "fundamental canons of contract construction require that [the Court] examine the plain language of the contract and the parties' intent, as evidenced by the contract's purpose and surrounding circumstances." As stated [previously by the Court], "[w]hen reading a contract, our goal is to discover the intention of the parties. Generally, we consider the contractual terms, the surrounding circumstances, and the purpose of the contract."

Highland Lakes Country Club & Cmty. Ass'n v. Franzino, 186 N.J. 99, 115-16 (2006) (internal citations omitted). Under that framework, then, a necessary predicate for proper contractual construction is to figure out *what the terms of a contract are* before proceeding to determine what they mean. This holds true for oral contracts as well as written contracts, for "parties may orally, by informal memorandum, or by both agree upon all the essential terms of a contract and effectively bind themselves thereon, if that is their intention . . . ." McBarron v. Kipling Woods,

6

L.L.C., 365 N.J. Super. 114, 116 (App. Div. 2004) (quoting Comerata v. Chaumont, Inc., 52 N.J. Super. 299, 305, 145 A.2d 471 (App. Div. 1958)).  But because the "determination of whether a valid oral contract was made . . . [is often] determined in large part by a credibility evaluation of witnesses[,] [t]he cases are legion that caution against the use of summary judgment to decide a case that turns on the intent and credibility of the parties."  Id. (citing Shebar v. Sanyo Bus. Sys. Corp., 111 N.J. 276, 291 (1988); Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 76 (1954); Ricciardi v. Weber, 350 N.J. Super. 453, 470 (App. Div. 2002)).

As discussed more fully below, the Court has grave concerns whether the parties entered into an enforceable oral agreement at all.  As a result, it is unable to determine at this juncture under what conditions Robert must be repaid.  Summary judgment is therefore denied.

**B.  Analysis**

The Court agrees with Robert that Eugene owes him money.  But the Court is not so sure whether the debt arises from a legally enforceable contract:

> It is fundamental that the essential element to the valid consummation of a contract is a meeting of the minds of the contracting parties and that until there is such a meeting of the minds either party may withdraw and end all negotiations. So long as negotiations are pending over matters relating to the contract, and which the parties regard as material to it, and until they are settled and their minds meet upon them, it is not a contract, although as to some matters they may be agreed.

De Vries v. Evening Journal Ass'n, 9 N.J. 117, 119-20 (1952).  Eugene's description of the "agreement" suggests evolving negotiations that were never fully consummated, i.e., he and Robert never agreed on the terms of repayment.  Under his version of the arrangement, payment was not due on a date certain, because the repayment "terms were not static, but were negotiated regularly on an ongoing basis between the parties."  Def. Br. at 8.  This is strong evidence that

7

the parties never arrived at a final agreement. Without such mutual assent, no contract regarding the terms of repayment could exist. The Court will not grant summary judgment when there is a material issue of fact as to whether an enforceable oral contract exists in the first place.

To grant summary judgment with respect to Eugene's liability, however, would be stating the obvious—Eugene candidly admits he owes his son money. But despite Robert's assertion that Eugene has admitted the terms of repayment, the Court can find nothing in Robert's evidentiary submissions that indisputably controverts Eugene's account about when and how much repayment is due. Upon repeated questioning by counsel, Robert failed to provide documentary evidence specifically reflecting that payment would be due upon demand or that refinancing would otherwise trigger repayment. See Giampiccolo Cert. Ex. A, 79:17-82:25; 103:1-15. Using emails from Eugene, he could only show that some payment was made at a time after Robert made a demand. Robert's position may indeed encompass an agreement between the parties, i.e., Eugene might have made such payments because he was obligated to do so after Robert made a demand. But Eugene argues that he paid periodically based on constantly evolving negotiations. And while Robert complains that Eugene offers "no documentary evidence whatsoever to dispute" the terms of the agreement, see Pl. Rep. Br. at 7, the Court cannot locate any hard evidence presented by Robert that proves the terms of the repayment obligation, either. While a finding that payment was legally due upon demand may be inferred by the fact that the demand temporally preceded payment, the Court declines to draw such a *post hoc, ergo propter hoc* conclusion as a matter of law. The documentary evidence does not sufficiently demonstrate that the inference Robert asks the Court to draw is beyond dispute.

Furthermore, some of Robert's evidence is amenable to the very interpretation that he argues against—that there were ongoing, non-static, and *non-final* negotiations concerning

repayment. Exhibit G, attached to Robert's Certification, shows the following statement by Eugene:

> The agreement between us as far as I understand it for the Canon View [P]roperty calls for an immediate repayment to you of 30[K] which I sent to you this afternoon, as well as 2 payments of [approximately] 180[K] each on April 30 and May 30. . . . It is my intent to do this as quickly as I can. . . . I am very glad we have reached an agreement to resolve our differences.

Robert's Cert. Ex. G. This statement could logically be taken to mean that Robert was satisfied with Eugene making progress payments as he became able to do so, again suggesting that no final terms were agreed upon. In other words, if one agrees that Robert was accepting payments consistent with Eugene's then-current financial ability, then it follows the arrangement did not contain a set date for final repayment.

Robert also submits Exhibit F with his Certification, in which Eugene states, "I guarantee the loan will be paid back on time." Robert's Cert. Ex. F. While this obviously could benefit Robert's case, one can also read the statement and have no idea what "on time" means. "On time" could mean any number of things: today, tomorrow, when the properties are sold, or when Eugene becomes fiscally capable of making the payments.

The Court is similarly unpersuaded that the amount owed to Robert can be pronounced summarily. While the statement "I agree that the $210,069 is the balance remaining" might seem at first glance to be dispositive, Eugene argues that this statement was taken out of context because $50,000 was part of a settlement agreement and not part of the loan. See Def. Br. at 11. Robert's only counterargument to this assertion is that it is fabricated. See Pl. Rep. Br. at 5. In fact, Robert's own evidentiary submissions by themselves create a material issue of fact

9

regarding the remaining balance under the loan. In his brief, Robert states in successive paragraphs:

> 30. By e-mail dated December 31, 2006, Defendant stated, "I agree that the $210,069 is the balance remaining."
>
> 31. Defendant has admitted in submissions to this Court that the approximate sum of $160,000.00 is due and owing from him to Plaintiff.

Pl. Br. at 8, ¶¶ 30-31. The Court is left with just one question—which amount is it? It appears to the Court that Robert is attempting to demonstrate inconsistencies in Eugene's assertions as to the amount owed. And Robert is free to make that argument at trial. But the differing statements are also susceptible to an alternative (and internally consistent) reading— that Eugene once owed $210,069, but because of the breakdown in settlement discussions, the alleged bonus flowing from the sale of the Oceano Property is no longer due to Robert.

Additionally, several of the emails submitted by Robert do not even contain a statement by Eugene himself. Instead, they are Robert's emails to Eugene that recount what Eugene purportedly said to him, inherently raising problems of reliability.

Finally, Robert argues that by refinancing the Oceano Property and allegedly using the proceeds for the Cliff Drive Property, Eugene breached the purported agreement. See Robert's Cert. ¶¶ 11, 14. Robert emphasizes that contrary to the position he asserts now, see Eugene's Cert. ¶ 9, Eugene previously stated that he used the proceeds of the refinancing to buy the Cliff Drive Property, see Giampiccolo Cert. Exs. F at 2, O. The Court notes the inconsistency; however, it is legally irrelevant to the issue here, since Eugene's position is that any refinancing of the loans is not a trigger for repayment. See Def. Br. at 9-10. Given that context, not only is

summary judgment that a breach occurred unavailable, but the existence of that contract term is in doubt.

The foregoing, while it suggests that a legal contract may not exist that governs the terms and amount of repayment, is not to say that Eugene owes no obligation to repay Robert—he most assuredly does. But such liability does not necessarily flow from the law of contract. Instead, where a debt is not evidenced by a legally valid contract, a quasi-contract (or contract implied in law) may support recovery. The Supreme Court of New Jersey has summarized the relief thus:

> In essence, a contract action implied-in-law is a restitutionary claim. Like the equitable doctrine of restitution, the key element of a quasi-contract claim is that one party has been unjustly enriched at the expense of another. Recovery under both doctrines is typically measured by the amount the defendant has benefitted from the plaintiff's performance. In a truer sense the court can force the fictionally breaching party (i.e., the enriched party) to perform; the performance required is to compensate the injured party. [T]here are only two "essential elements" of a contract implied in law: (1) that the defendant has received a benefit from the plaintiff, and (2) that the retention of the benefit by the defendant is inequitable.

Wanaque Borough Sewerage Auth. v. Twp. of W. Milford, 144 N.J. 564, 575 (1996); see also Woodview Condominium Ass'n, Inc. v. Shanahan, 391 N.J. Super. 170, 178 (App. Div. 2007) (citing Wanaque).

Here, where the non-static nature of a series of loans does not support summary enforcement of a supposed oral contract, liability is more aptly analyzed under unjust enrichment principles. Robert loaned Eugene substantial amounts of money, and he now alleges that Eugene has used the money for over six years without repaying approximately one-fifth of the principal. The requisite elements outlined in Wanaque are thus satisfied: Eugene has received and

continuously used a benefit conferred by Robert (the loan), and retention of a portion of the loaned funds without repayment would be highly inequitable. The Court believes that this quasi-contract/unjust enrichment analysis, which is inherent in the fourth count of the complaint, more appropriately fits the facts alleged and the proofs submitted. The Court notes, however, that at this point in time, the terms of repayment (i.e., amount and timing) still remain uncertain. Summary judgment is also inappropriate under unjust enrichment principles.

### C. Remaining Issues

#### 1. Eugene's Rule 56.1 Statement

In his opposition papers, Eugene includes as his brief's fact section a "response" to Robert's statement of material facts instead of a separate statement as is required by Local Civil Rule 56.1. The statement's numbered paragraphs correspond to the numbered statements contained in Robert's Rule 56.1 statement, and either admit or deny each allegation. Where he denies a statement, Eugene appends explanations to supplement his denial.

Robert argues that because Eugene has failed to submit his own statement of "material facts as to which there exists or does not exist a genuine issue," he is in violation of the rule. See Loc. Civ. R. 56.1. He thus asks the Court to deem admitted "any and all facts not addressed by [Eugene] in his opposition brief . . . ." Pl. Rep. Br. at 2-3. Robert further objects to Eugene's narrative responses and alleged failure to respond to some of Robert's material statements at all. Id.

While Local Civil Rule 56.1 does require litigants to submit their own statement of material facts, failure to abide by the letter of the rule does not require a particular response. See, e.g., Comose v. N.J. transit Rail Operations, Inc., 2000 U.S. Dist. LEXIS 20790 (D.N.J. Oct. 6, 2000) ("While th[e] court could choose to deny summary judgment on this ground alone, . . .

the court chooses instead to admonish that the parties should consult the local rules in future cases."); Lemke v. Intl. Total Servs., 56 F. Supp. 2d 472, 477 n.4 (D.N.J. 1999) (where parties failed to submit a Rule 56.1 statement, admonishing the parties to consult the local rules in future cases); Hancox v. Lockheed Martin Tech. Servs.,2007 U.S. Dist. Lexis 44816 (D.N.J. June 21, 2007).

The Court will accept the factual submissions in Eugene's brief as adequate under Local Civil Rule 56.1. Despite Robert's objection, the Court cannot locate any factual statements of significance that Eugene does not address in the response or in his brief. His submission meets the principle embodied by the rule—that the parties narrow the key issues so the Court can adjudicate the motion without embarking on a judicial scavenger hunt for relevant facts.

    2. Equitable Lien

Robert also requests the Court to impose an equitable lien on the Cliff Drive Property. Pl. Br. at 14. Because, Robert alleges, Eugene has taken the proceeds from the refinancing of the Oceano Property loan and purchased the Cliff Drive Property, he is entitled to a primary lien on that property.

An equitable lien "constitutes a special right that is a combination of a legally cognizable debt and a binding agreement to subject property to the payment of that claim." Franzino, 186 N.J. at 111. In New Jersey, "[f]or an equitable lien to arise there must be a debt owing from one person to another, specific property to which the debt attaches, and an intent, expressed or implied, that the property will serve as security for the payment of the debt." Id. at 111-12 (internal citation omitted).

Robert correctly points out that his request is unopposed and asks the Court to grant the relief as uncontested. See SEC v. Chester Holdings, Ltd., 41 F. Supp. 2d 505, 508 & n.7 (D.N.J.

1999). But there is also a substantive basis to grant the relief: Eugene took a loan out from his son without benefit of a written contract, without definite repayment terms, and has proceeded to use the funds for six years without repaying hundreds of thousands of dollars.

Additionally, Eugene himself has admitted, and there is evidentiary support for the admission, that he used the funds derived from the Oceano Property refinance to purchase the Cliff Drive Property. See Giampiccolo Cert. Exs. F at no. 3; K at no. 3; O. Albeit the Court has previously noted the factual dispute about whether the refinance led to the purchase of the Cliff Drive property, there exists a sufficient nexus (i.e., an implied intent to encumber the property purchased) between Eugene's refinancing activity and the purchase. See Franzino, 186 N.J. at 111-12. Eugene himself has suggested that the Cliff Drive Property itself was integrally connected to the loans (hence his claim that Robert has lost his $50,000 bonus). According to him, only when Robert backed out of the investment enterprise related to the sale of the Oceano Property did the Cliff Drive Property lose its connection to the debt. Robert's request for an equitable lien on the Cliff Drive Property, superior to all other encumbrances, *nunc pro tunc* to January 1, 2006, is granted. The amount of the lien shall reflect the escrowed funds (approximately $138,000.00) already committed to satisfaction of the unpaid debt.

    3. Rule 11 Sanctions

Finally, Eugene asks the Court to impose sanctions on Robert for maliciously placing lis pendens notices on the Cliff Drive Property. Def. Br. at 11. The notices have been removed pursuant to the escrow agreement entered into by the parties. The success of Robert's request for an equitable lien on the Cliff Drive Property indicates that the Court is not persuaded by Eugene's arguments for sanctions under Rule 11. His request is denied.

## VI. CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied. Robert's request that an equitable lien be imposed on the Cliff Drive Property is granted. Now that the Court has issued these rulings, counsel shall report to Magistrate Judge Patty Shwartz no later than Monday, December 8, 2008 to report on settlement. If the parties are unable to settle their differences, they are directed to mediation, costs of which shall be divided equally. The Court will enter an appropriate Order.

/s/  Katharine S. Hayden

KATHARINE S. HAYDEN
UNITED STATES DISTRICT JUDGES